## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FOREST GUARDIANS, CARSON
FOREST WATCH,

      Plaintiffs,

vs.                                  No. CIV 05-0372 JB/DJS

UNITED STATES FOREST SERVICE,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Preliminary

Injunction and Memorandum Brief in Support of Motion for Preliminary Injunction, filed September

1, 2005 (Doc. 13); (ii) the Plaintiffs' Reply Memorandum Brief in Support of Motion for Preliminary

Injunction, filed September 22, 2005 (Doc. 29); (iii) the Federal Defendants' Response Brief on the

Merits, filed January 27, 2006 (Doc. 39); and (iv) the Plaintiffs' Reply Brief on the Merits, filed

February 6, 2006 (Doc. 40).  The primary issues are: (i) whether the Defendant United States Forest

Service ("USFS") violated the National Environmental Policy Act ("NEPA"); (ii) whether the USFS

violated the National Forest Management Act ("NFMA"); and (iii) whether the Court should enjoin

the continuation of the Agua Caballos Projects ("A/C Projects").  The Court finds that the Plaintiffs

failed to exhaust their administrative appeals concerning their NEPA claims.  The Court also finds

that the USFS was required to apply the 2000 transition regulations in accordance with NFMA, but

the Plaintiffs failed to exhaust any claims that the 2000 rules applied.  Finally, the Court finds that the

USFS did not violate NFMA's consistency or substantive provisions.  The Court will therefore not

issue an injunction.  The Court will deny the appeal.

## FACTUAL BACKGROUND

**1.     Carson National Forest Plan.**

The Carson National Forest Plan ("Carson Forest Plan") was adopted in 1986 and "sets forth broad programmatic management direction for the Carson National Forest."  AR 008520.  The Forest Plan listed twelve wildlife species as Management Indicator Species ("MIS") "to monitor the conditions of the forest's ecosystems."  AR 008649.  The Carson Forest Plan states that the Plan "was developed in compliance with the NFMA regulations (36 CFR 219) . . . ."  AR 000421.

The Carson Forest Plan includes a Monitoring Plan, which states that the "purpose of monitoring and evaluating the implementation of the Forest Plan is to inform the decision maker of the progress toward achieving the goals, objectives, and standards and guidelines" of the Forest Plan.  AR 000600.  The Monitoring Plan provides: "A detailed annual monitoring action program will be prepared as part of the total Forest annual program of work."  Id.  The Monitoring Plan provides for "monitoring requirements" and "measurement techniques."  Id. at 000601.

Under its "Wildlife" section, the Monitoring Plan provides that MIS population and habitat trends will be monitored in part to comply with federal and state regulations.  See id. at 000602-000603.  The Monitoring Plan provides specific population monitoring methods.  See id. at 000604-000609.  The Monitoring Plan states that "management indicator species" will be monitored "as required by law."  Id. at 000608-000609.

The Monitoring Plan provides that the USFS will conduct five years of population surveys to establish baseline data for MIS, and then subsequent population surveys on an annual or biennial basis, depending on the MIS at issue.  See id. at 000605-000608; Federal Defendants' Answer to Plaintiffs' April 4, 2005 Complaint ¶ 80, at 8, filed June 3, 2005 (Doc. 6).  The MIS Assessment

("MISA") notes that the Final Environmental Impact Statement ("FEIS") provides: "Populations of all indicator species, with the possible exception of certain rare animals, will be managed at levels greatly exceeding minimum viable populations."   AR 011562 (citing the FEIS at 152).

      **2.**      **Factual and Procedural History of the A/C Projects.**

      The A/C Projects are silvicultural treatments and related activities on the El Rito Ranger District, Carson National Forest within Rio Arriba County in northern New Mexico, approximately six miles north of the small mountain community of El Rito and adjacent to the village of Vallecitos. See AR 0008520.  To assess potential environmental and other effects, the USFS designated an analysis area of 23,767 acres for the Projects.  See AR 012612.  Of these acres, the selected alternative for the Projects calls for harvests of saw timber on 3,884 acres and sets aside twenty percent of the analysis  area as old growth.  See id.

      Elevations in the analysis area range from approximately 7,000 feet near the eastern boundary to over 9,800 feet at the extreme northwest corner.  See AR 008520.  The analysis area consists of various vegetation: sixty-eight percent ponderosa pine, seventeen percent mixed conifer, six percent high elevation grassland, four percent aspen, four percent pinon-juniper woodland, and one percent spruce-fir.  See id.

      The Projects' purpose, in part, is to address adverse forest conditions resulting from intensive logging in the early 1900s, livestock grazing, and fire suppression.  See AR 008520-008522.  A consequence of these historical activities was the establishment of dense stands of trees of the same age that are growing slowly because of limited space and competition for water, light, and nutrients. See id.  These high tree density conditions prevent trees from "releasing," or growing into the large trees, indicative of mature and old growth forest stands.  Id.  In addition, fire suppression has resulted

in moderate to high concentrations of fuel materials in ponderosa pine stands  See id.  The USFS

describes the purpose of the project as follows: "[T]he proposal is designed to restore forest and

watershed conditions and provide sawtimber and wood products to local businesses on the Vallecitos

Federal Sustained Yield Unit and the El Rito Ranger District of the Carson National Forest."  AR

008520.

The analysis area for the Projects presently lacks the diversity of forest stand structures and

age classes conducive for a healthy, functioning ecosystem of plants and wildlife.  For example, in

ponderosa pine  and mixed conifer areas, the forest is dominated by tree stands stalled in two of the

six vegetation structural stages ("VSS") -- stages 3 and 4 -- that the USFS uses to describe forest

conditions -- VSS state 1 represents openings and VSS stage 6 represents old growth.  See id.

008522, 008591.  "Vegetation structural stage [VSS] is a generalized description of forest growth

and aging stages based on the majority of trees in the specific diameter distribution of the stand."  AR

008926; AR 008521-008522.

While the FEIS calls for a more even distribution of forest stands across the VSS scale, thick

patches of trees in the middle-age stand classes, VSS 3 and VSS 4, dominate ninety percent of the

ponderosa pine and mixed conifer in the analysis area.  See AR 008522.  The Projects thus were

developed to improve the health of ponderosa pine stands and mixed conifer stands by "mov[ing]

stands out of VSS classes 3 and 4 and into the larger and smaller classes," and to provide for "more

diversity in composition across the landscape – including clumps of trees interspersed with small

openings and a healthy distribution of grasses, forbs and shrubs in the forest understory."  Id.

Most of the A/C analysis area is within the Vallecitos Federal Sustained Yield Unit, which was

established in 1948 in accordance with the Sustained Yield Forest Management Act of March 29,

1944, 16 U.S.C. §§ 583(a)-(i).  See AR 008882.  The Unit includes about 73,400 acres of National

Forest System lands, of which about 55,100 acres are classified as suitable for timber management.

See id.  The Unit's primary purpose is to provide a supply of timber and other forest products to help

maintain a stable economy for Vallecitos and nearby areas.  See id.  Wood product sales from the

Unit are designed to: (i) "provide local residents with an opportunity to establish a wood products

business"; (ii) "maintain steady employment opportunities in the Vallecitos community and nearby

areas from year to year"; (iii) "provide opportunities of employment for a local resident workforce";

and (iv) "provide opportunity for those living within and near the Unit to obtain lumber for their local

requirements."  Id.  To achieve these objectives, sawtimber from the Unit "is sold to approved

responsible operators ("AROs") only."  Id.  The operators are required to maintain a primary

manufacturing facility within the employment area that the Forest Plan defines.  See id.  The operators

are also obligated to permit local people to buy timber from the plant for their personal use, and

"bonafide residents of the local area must fill ninety-five percent of all nonsupervisory jobs."  Id.

Project planning documents provide that the A/C Projects have the potential to affect the

following MIS and associated habitat types: plaint titmouse (pinon-juniper canopies), Abert's squirrel

(interlocking canopies), hairy woodpecker (snags), red squirrel (mixed conifer), Rocky Mountain elk

(general forest), Merriam's turkey (old growth pine), resident trout (perennial streams and riparian

areas), and aquatic macroinvertebrates (perennial streams and riparian areas).  See AR 012622-23.

The Final Supplement to the FEIS ("FSFEIS") states that "MIS were selected because population

changes are believed to indicate the effects of management activities that occur on the forest."  AR

012622.  The FSFEIS language tracks the language in 36 C.F.R. § 219.19(a)(1) of the 1982

regulations.

The USFS started planning efforts for the A/C Projects in 1992.  Such efforts were prolonged by "several lapses" from interruptions such as personnel issues and shifting priorities.  AR 012618.  On June 3, 2002, Forest Supervisor, Martin Chavez, authorized the timber sale project.  See AR 009009-009017.

On August 19, 2002, several parties, including Forest Guardians, filed an administrative appeal of the authorization.  See AR 009103-009114.  The appealing parties raised several alleged inadequacies concerning the environmental analysis, including a claim that the USFS had not complied with NEPA and NFMA's substantive, procedural, and 1982 regulatory provisions.  See id.  The Deputy Regional Forester granted the appellants requested relief on October 1, 2002, and reversed the Forest Supervisor's authorization of the A/C Projects.  See AR 009120-009121.  The Deputy Regional Forester indicated that the authorization was being reversed because "the MIS analysis was incomplete," and gave the following instructions:

> 1) Complete the analysis of the effects on MIS, considering the population and habitat information collected at the forest plan level or at an appropriate geographical scale for a particular species.
>
> 2) Upon completion of this analysis, circulate a Supplemental Environmental Impact Statement for public comment and issue a new decision under 36 CFR 215.

Id. at 009121.

The USFS issued a Supplement to the Final Environmental Impact Statement ("SFEIS") in June 2003, stating that "[t]he first of the two appeal instructions has been fulfilled" and that "[a]n updated Forest-wide Management Indicator Species Assessment for the Carson National Forest was completed in early May 2003."  AR 011790.  The USFS subsequently circulated the SFEIS to the public as the second of the two appeal instructions ordered.  See AR 011898-011899; 011901.  The

USFS then issued the FSFEIS, see AR 012606, along with a new Record of Decision ("ROD") that re-authorized the A/C timber sale project on April 13, 2004, see AR 012790.

On July 12, 2004, Forest Guardians filed an administrative appeal of the decision to re-authorize the project. See AR 012849. The appeal raised similar issues as the prior appeal, including allegations of NFMA violations. See id. at 012851-012856. The Deputy Regional Supervisor denied Forest Guardians' appeal, and affirmed the re-authorization of the A/C timber sale project on August 26, 2004. See AR 012864-012878.

### 3.   USFS' Interpretation of MIS Population Information.

"MIS are analogous to the famed canaries once used to monitor air in coal mines. They are a 'bellwether' 'for other species that have the same special habitat needs or population characteristics,' and serve as 'a proxy for determining the effects of management activities on other species.'" Utah Envtl. Cong. v. Bosworth ("UEC II"), 439 F.3d 1184, 1190 (10th Cir. 2006)(internal citations omitted). The glossary for the USFS' Carson Forest Plan provides the following definition of MIS: "Those species selected in the planning process to monitor the effects of planned management activities on viable populations of all wildlife and fish species, including those species that are socially or economically important." AR 000665.

The USFS' interpretation of its regulations is that quantitative population information -- as well as habitat information -- is to be gathered at an appropriate geographic scope for each MIS, outside the context and independent of any site-specific project proposal. See Federal Defendants' Response Brief on the Merits at 1; AR 011561-011562. There is thus one body of information for each MIS that is maintained at the Forest-level, and that information indicates how MIS populations are doing as a whole and what effect Forest management practices may be having on those

populations over time.  See Response at 1.

As the USFS explained in its May 2003 "Management Indicator Species Assessment" for the

Carson National Forest:

> Population trend is most appropriately addressed at scales above the project level. Many of these selected MIS species occur and range far beyond a local scale. Individuals, family groups or herds, such as elk, annually use areas much larger than the analysis area and population trend must be examined on a greater scale to be meaningful.  Evidence from long-term censuses suggests that few natural populations or communities persist at or near equilibrium on a local scale.  At a site-specific project level, there is a great deal of fluctuation in wide ranging populations.  For this reason, it is not appropriate to determine population trend at the local level.  For National Forest Management Act implementation, population trend is addressed at the scale of the Carson National Forest.  Even at this level, population trend information is not likely to be indicative of overall population trends of a species.

AR 011561-0011562.

### 4.   The 1982 Regulations, the Carson Forest Plan, and the A/C Projects.

The Plaintiffs contends that the planning documents for the A/C Projects show that the USFS

applied the 1982 planning regulations in the planning and decision making process for such timber

sale.[1]  See Plaintiffs' Motion for Preliminary Injunction and Memorandum Brief in Support of Motion

for Preliminary Injunction at 11 ("Motion for Preliminary Injunction").  The Plaintiffs point to the

USFS' May 2003 MISA and assert that it contains a lengthy discussion of the MIS population

monitoring requirements under the 1982 regulations, and details how the USFS complied with both

---

[1]  The Plaintiffs note in their briefing that the environmental documentation prepared in connection with the first A/C timber sale decision -- which the Deputy Regional Forester, in response to Forest Guardians' administrative appeal, reversed -- including the May 9, 2002 Environmental Impact Statement ("EIS") for the project, also acknowledged that the project was planned pursuant to the 1982 regulations.  See Plaintiffs' Motion for Preliminary Injunction and Memorandum Brief in Support of Motion for Preliminary Injunction at 11 (citing AR 008650-008651 and AR 008646). Likewise, the Plaintiffs contend that the June 3, 2002 Decision for the A/C Projects specifically acknowledges the controlling application of the 1982 planning rule.  See id. at 12 (citing AR 009008).

the procedural and substantive requirements.  See id. at 11 (citing AR 011560-62).  The Plaintiffs contend that the FSFEIS also acknowledges that the 1982 regulation provisions concerning biodiversity governed the planning process.  See id. (citing AR 012626).  The FSFEIS states that it "is the mandate of the Forest Service to manage fish and wildlife habitat 'to maintain viable populations of existing native and desired non-native vertebrate species. . . . .' (36 CFR 219.19)." AR 012624.  The FSFEIS additionally states that "MIS were selected because population changes are believed to indicate the effects of management activities that occur on the forest."  AR 012622.

The Plaintiffs next point out that the ROD for the A/C Projects indicates the USFS' application of the 1982 regulations.  See Motion for Preliminary Injunction at 12.  The ROD states, with respect to biodiversity, that monitoring of MIS in the project area will -- as the 1982 rules require -- "ensure viable populations are maintained," and further acknowledges that the regeneration provision of the 1982 regulations, see 36 C.F.R. § 219.27(b), was applied during project planning. See AR 012795; 012802.  Finally, the Plaintiffs assert that the Regional Deputy Forester's decision on Forest Guardians' administrative appeal of the A/C Projects specifically references the MIS population monitoring requirements of the 1982 regulation and avers that the USFS adhered to the rule's requirements in project planning and decision-making.  See Motion for Preliminary Injunction at 12 (citing AR 012866-012867).

The Plaintiffs also contend that the Carson Forest Plan reflects the 1982 regulations.  See id. at 13.  The Carson Forest Plan states that it "was developed in compliance with the NFMA regulations."  AR 000421.  The Forest Plan's Monitoring Plan specifically states that "[p]opulation and habitat trends of management indicator species" will be monitored.  AR 000602, 000608-000609.

## PROCEDURAL BACKGROUND

The Plaintiffs allege violations of NFMA, 16 U.S.C. §§ 1600-1614, and NEPA, 42 U.S.C. §§ 4321-4347.  On September 1, 2005, the Plaintiffs filed a Motion for Preliminary Injunction.  See Doc. 13.  Plaintiffs Forest Guardians and Carson Forest Watch challenge the USFS' April 13, 2004 decision to authorize the A/C timber sale project in the Carson National Forest.  Because the USFS was unwilling to stay implementation of the project, the Plaintiffs have sought injunctive relief to maintain the status quo.  The Plaintiffs ask this Court for an injunction enjoining all ground-disturbing work in connection with the A/C timber sale project on the Carson National Forest.

Under the Court's December 13, 2005 Order, the Plaintiffs' Motion for Preliminary Injunction as well as the Plaintiffs' Reply Memorandum Brief in Support of Motion for Preliminary Injunction are deemed the Plaintiffs' "Opening Brief" on the Merits.  Pursuant to the Court's Memorandum Opinion and Order, filed December 13, 2005 (Doc. 37), the USFS filed a Response Brief on the Merits.

## STANDARDS OF REVIEW

The Court's review is under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  "The [APA] makes final agency action for which there is no other adequate remedy in a court subject to judicial review."   Utahns for Better Transportation v. United States Department of Transportation, 305 F.3d 1152, 1164 (10th Cir. 2002).  "Because neither NEPA nor NFMA provide a private right of action," courts review final agency action under the APA.  Utah Envtl. Cong. v. Bosworth("UEC III"), 443 F.3d 732. 740 (10th Cir. 2006).  Pursuant to Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself

-10-

by referring to the Federal Rules of Appellate Procedure." Id. at 1580.

Because NFMA and NEPA do not incorporate an independent standard of review, the APA -- 5 U.S.C. § 706 -- governs the Court's review of the violations alleged. See Utahns for Better Transportation v. United States Department of Transportation, 305 F.3d at 1164 (reviewing NEPA claim); Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999)(reviewing NFMA claim). Under the APA, a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Plaintiffs acknowledge that the appropriate standard of review in a case challenging final agency action pursuant to NFMA and NEPA -- "the arbitrary and capricious" standard of review -- is a deferential standard. Motion for Preliminary Injunction at 3.

A deferential approach is particularly appropriate where the challenged decision implicates substantial agency expertise. See, e.g., March v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989)("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'")(citing Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)); Lamb v. Thompson, 265 F.3d 1038, 1041-1042 (10th Cir. 2001)(recognizing "the 'highly complex' issues raised by management of the national forests"); Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103 (1983)("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential."). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." March v. Oregon Natural Resources Council, 490 U.S. at 378.

When a federal agency such as the USFS interprets its own regulations, its interpretation is

afforded special consideration.  "[A]n agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference."  BAR MK Ranches v. Yuetter, 994 F.2d 735, 738 (10th Cir. 1993)(citing City of Gillette, Wyoming v. FERC, 737 F.2d 883, 884-885 (10th Cir. 1984)). Pursuant to this highly deferential standard, a federal court may reject an agency's interpretation of its own regulations only when the interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning."  BAR MK Ranches, 994 F.2d at 738 (citations omitted).  See Stinson v. United States, 508 U.S. 36, 45 (1993)("Provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.")(citations and internal quotations omitted).  However, "such deference is not unfettered nor always due."  Cherokee Nation of Oklahoma v. Norton, 389 F.3d 1074, 1078 (10th Cir. 2004).

Pursuant to the APA, judicial review of the merits of the Plaintiffs' claims is to be based on a "review [of] the whole record or those parts of it cited by a party."  5 U.S.C. § 706(2).  The "record" referenced in § 706(2) is generally limited to the administrative record that was before the agency when the agency rendered its decision.  Florida Power and Light Co. v. Lorion, 470 U.S. 729, 743-744 (1985).  See Camp v. Pitts, 411 U.S. 138, 142 (1973)(stating that "the focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court").  In Franklin Savings Ass'n. v. Director, Office of Thrift Supervision, 934 F.2d 1127, 1137-38 (10th Cir. 1991), the United States Court of Appeals for the Tenth Circuit held that review of agency actions "shall be confined to the administrative record" and that "[a] reviewing court may go outside of the administrative record only for limited purposes."

To fulfill its function under the arbitrary and capricious standard of review, a court should

engage in a "thorough, probing, in-depth review."  Wyoming v. United States, 279 F.3d 1214, 1238

(10th Cir. 2002)(citation omitted).  "[T]his inquiry into the facts is to be searching and careful . . .

."  McAlpine v. United States, 112 F.3d 1429, 1436 (10th Cir. 1997)(citation and internal quotations

omitted).  The Tenth Circuit explains the relevant standard of review:

> In determining whether the agency acted in an arbitrary and capricious manner, we
> must ensure that the agency decision was based on a consideration of the relevant
> factors and examine whether there has been a clear error of judgment.  We consider
> an agency decision arbitrary and capricious if the agency relied on factors which
> Congress had not intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

Colorado Environmental Coalition v. Dombeck, 185 F.3d at 1167 (citations and internal quotations

omitted).  See Utah Envtl. Cong. v. Bosworth ("UEC I"), 372 F.3d 1219, 1223 (2004).  Although

the review must be thorough, it is a narrow standard:

> A reviewing court must "consider whether the decision was based on a consideration
> of the relevant factors and examine whether there has been a clear error of judgment.
> . . .  Although this inquiry into the facts is to be searching and careful, the ultimate
> standard of review is a narrow one.  The court is not empowered to substitute its
> judgment for that of the agency."  Citizens to Preserve Overton Park v. Volpe, supra,
> 401 U.S. at 416.  The agency must articulate a "rational connection between the facts
> found and the choice made."  Burlington Truck Lines v. United States, 371 U.S. 156,
> 168 (1962).  While we may not supply a reasoned basis for the agency's action that
> the agency itself has not given, SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), we
> will uphold a decision of less than ideal clarity if the agency's path may reasonably be
> discerned.  Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945).

Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286 (1974).  See Friend

of the Earth v. Hintz, 800 F.2d 822, 831 (9th Cir. 1986)("The court may not set aside agency action

as arbitrary and capricious unless there is no rational basis for the action.")(citation omitted).

**LEGAL STANDARD**

1.    **National Forest Planning and Management.**

The USFS, an agency of the United States Department of Agriculture, administers the National Forest System.  The Organic Administration Act of 1897, 16 U.S.C. §§ 471-482, provided that lands may be reserved as National Forests.  In 1960, Congress enacted the Multiple-Use-Sustained-Yield Act, which established that the USFS should manage National Forest System lands for outdoor recreation, range, timber, watershed management, fish and wildlife purposes, and wilderness in a manner that the agency deems will best meet the needs of the American people pursuant to the principles of multiple use and sustained yield.  See 16 U.S.C. §§ 528-531.

2.    **NFMA.**

Congress enacted NFMA in 1976 to assure that all USFS management activities on national forest lands: (i) are preceded by a comprehensive environmental review process -- at both the forest-wide and site-specific levels; and (ii) provide for the protection of all the various natural resources of the forest, including the wildlife resource.  NFMA establishes a framework for the USFS to "develop, maintain, and, as appropriate, revise land and resource management plans ["LRMPs" or "Forest Plans"] for units of the National Forest System . . . ."  16 U.S.C. § 1604(a).

In Colorado Environmental Coalition v. Dombeck, the Tenth Circuit set out NFMA's forest management scheme's requirements:

> The National Forest Management Act directs the Forest Service to develop Land and Resource Management Plans ("Forest Plans") by which to manage each National Forest under principles of "multiple-use" and "sustained yield."  16 U.S.C. § 1604. Forest management occurs at two distinct levels.  See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 118 S. Ct. 1665, 1668-69, 140 L. Ed. 2d 921 (1998).
>
> At the first level, the Forest Service develops the Forest Plan, a broad, programmatic

document, accompanied by an environmental impact statement and public review process conducted in accordance with the National Environmental Policy Act. 42 U.S.C. § 4331 et seq.; see also 16 U.S.C. § 1604(d); 36 C.F.R. § 219.10(b). The Forest Plan must incorporate multiple forest uses, and thus coordinate the management of "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). The Forest Plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." Id. at § 1604(g)(3)(B).

At the second level, the Forest Service implements the Forest Plan by approving (with or without modification) or disapproving particular projects . . . . Proposed projects must be consistent with the Forest Plan, id. at § 1604(i), 36 C.F.R. § 219.10(e), and are subject to further National Environmental Policy Act review. See Ohio Forestry Ass'n, 118 S. Ct. at 1668-69.

Colorado Environmental Coalition v. Dombeck, 185 F.3d at 1167-68. Forest Plans establish broad planning goals and objectives, and identify guidelines for management of forest resources, ensuring consideration of both economic and environmental factors. See 16 U.S.C. § 1604(g)(1)-(3).

Implementation of plan standards and guidelines occurs at site-specific projects in accordance with the Forest Plans. See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1512 (9th Cir. 1992). "Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Proposals for site-specific projects are not only required to be consistent with the Forest Plan, but also are subject to analysis under NEPA. See Idaho Conservation League v. Mumma, 956 F.2d at 1511-12. The Supreme Court has described the relationship between forest-wide planning and planning for site-specific projects:

Although the [Forest] Plan sets logging goals, selects the areas of the forest that are suited to timber production, and determines which "probable methods of harvest," are appropriate, it does not itself authorize the cutting of any trees. Before the Forest Service can permit the logging, it must: (a) propose a specific area in which logging will take place and the harvesting methods to be sued; (b) ensure that the project is

consistent with the Plan; (c) provide those affected by proposed logging notice and an opportunity to be heard; (d) conduct an environmental analysis pursuant to [NEPA]; . . . and (e) subsequently make a final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court.

Ohio Forestry Assn. v. Sierra Club, 523 U.S. 726, 729-730 (1998)(citations and internal quotations omitted).

### a.     Forest Plans and Consistency.

As pointed out in Colorado Environmental Coalition v. Dombeck, NFMA requires the USFS to develop a Land and Resource Management Plan -- or "Forest Plan" -- for each unit of the national forest system.  16 U.S.C. § 1604(a).  In most instances, as in this case, the "unit" of national forest lands that is the subject of a Forest Plan is a single national forest.  NFMA requires the USFS to prepare a new Forest Plan for national forest units at least once every fifteen years.  See 16 U.S.C. § 1604(f)(5)(A).  Once the USFS adopts a Forest Plan to guide management decisions for a national forest, "[a]ll projects and decisions [within that national forest] must be consistent with the overall forest plan."  Colorado Off Highway Vehicle Coalition v. United States Forest Service, 357 F.3d 1130, 1132 (10th Cir. 2004)(citation omitted).  See also UEC II, 439 F.3d at 1188 ("[I]ndividual projects . . . must comply with the Forest Plan and NFMA.").

Forest Plans guide all management activities on the National Forests and must "provide for multiple use and sustained yield of the products and services" derived from the National Forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).

In Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004), the Supreme Court held that federal courts do not have authority to compel a federal agency to carry out monitoring and other

-16-

commitments in its land use plans.  See id. at 66-72.  The Supreme court explained that, unlike a statutory command requiring a discrete agency action by a certain date, the land use plans merely set forth a federal agency's ordering of priorities, and do not bind the agency to perform any action enforceable under 5 U.S.C. § 706(1).  See id. at 71.  The Supreme Court noted that "a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them."  Id.

The Tenth Circuit, in UEC III, 443 F.3d 732, recently clarified the USFS' monitoring obligations as found in a Forest Plan.  The plaintiffs in UEC III contended that the Forest Plan required the USFS to collect annual population trend data as a condition precedent to the approval of the site-specific project.  See id. at 749.  The court noted that "we may review a monitoring program to the extent it bears on the approval of a particular project."  Id. (citing Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d at 922, 926 n.6 (9th Cir. 1999).  The Tenth Circuit went on to state that, "if a project's approval is conditioned upon the fulfillment of certain monitoring obligations, a plaintiff may bring a claim of deficient monitoring.  Without such a relationship, a claim of deficient monitoring simply is not cognizable."  Id. at 750.  Thus, while the Supreme Court's holding in Norton specifically dealt with a failure to act claim under § 706(1), the Tenth Circuit, in UEC III, addressed NFMA's consistency requirements in connection with site-specific project decisions.

### b.       Site-Specific Projects.

The level of USFS planning below the Forest Plans, where implementation of plan standards and guidelines occurs, is that of site-specific projects.  See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1512 (9th Cir. 1992).  Project-level implementation takes many forms, and all such

"[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National

Forest System lands shall be consistent with the land management plans."  16 U.S.C. § 1604(i).  In

addition to being consistent with the Forest Plan, proposals for site-specific projects also are

subjected to further analysis under NEPA.  See Idaho Conservation League v. Mumma, 956 F.2d at

1511-12.

Unlike NEPA, which imposes only procedural requirements on the USFS in its planning and

decision-making processes, NFMA imposes substantive requirements and constraints on the USFS

in its management of national forest lands.  See Inland Empire Public Lands Council v. United States

Forest Service, 88 F.3d 754, 757-58 (9th Cir. 1996)(comparing NEPA's procedural requirements

with NFMA's substantive requirements).  Under NFMA's management scheme, compliance with this

statutory bio-diversity obligation is achieved by developing a Forest Plan which assures that viable

populations of native wildlife species are protected in the course of national forest management:

> [T]he forest plan must comply with substantive requirements of the Forest Act designed to ensure continued diversity of plant and animal communities and the continued viability of wildlife in the forest, including the requirement that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area."

Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957, 961 (9th Cir. 2002)(citing 16 U.S.C. §

1604(g)(3)(B)).

Relying on NFMA's plain language, the Tenth Circuit took a similar position in UEC II,

stating that, "[a]s part of its substantive responsibilities, the Forest Plan must 'provide for diversity

of plant and animal communities based on the suitability and capability of the specific land in order

to meet overall multiple-use objectives.'" 439 F.3d at 1188 (citing 16 U.S.C. § 1604(g)(3)(B)).

-18-

### 3.      **NFMA's Regulatory Framework.**

NFMA mandates that the Department of Agriculture create both forest plans, see 16 U.S.C.

§ 1604(a), and regulations, see 16 U.S.C. § 1604(g) to: "provide . . . for protection, management,

and development of the National Forest System, including forest development roads and trails; for

cooperative Forest Service programs; and for research," 16 U.S.C. § 1602.  The agency prepared the

Carson Forest Plan for the Carson National Forest so that "all . . . activities affecting these lands . .

. will be based on the Forest Plan."  AR 000420.

### a.      **1982 Regulations.**

The Department promulgated detailed regulations in 1982 ("1982 rules").  See 36 C.F.R. 219

(1999).  The 1982 rules specified the selection and monitoring of MIS.  See 36 C.F.R. § 219.19

(1999).  "The [1982] regulations implementing NFMA provide[d] a minimum level of protection by

mandating that the Forest Service manage fish and wildlife habitats to insure minimum viable

populations of species in planning areas."  Sierra Club v. Espy, 38 F.3d 792, 800-801 (5th Cir.

1994)(citing 36 C.F.R. § 219.19).  36 C.F.R. § 219.19, the 1982 regulation, which imposed a

substantive duty on the USFS to assure the conservation of wildlife diversity in its national forest

management activities, provided in pertinent part:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing
> native and desired non-native vertebrate species in the planning area.  For planning
> purposes, a viable population shall be regarded as one which has the estimated
> numbers and distribution of reproductive individuals to insure its continued existence
> is well distributed in the planning area.  In order to insure that viable populations will
> be maintained, habitat must be provided to support, at least, a minimum number of
> reproductive individuals and that habitat must be well distributed so that those
> individuals can interact with others in the planning area.

The 1982 regulatory scheme required the USFS to identify MIS whose "population changes

-19-

are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1). The 1982 rules required the USFS to monitor population trends of designated MIS so that the USFS could assess the extent to which its management decisions were affecting MIS and, by "proxy," those wildlife species that have the same habitat requirements as each of the designated MIS: "Population trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6). The Tenth Circuit concluded in UEC I "that § 219.19 requires the Forest Service to use actual, quantitative population data to effectuate its MIS monitoring obligations" and "to estimate the effects of any forest management activities on the animal population trends, and determine the relationship between management activities and population trend changes." UEC I, 372 F.3d at 1226-27.

> ### b.     The 2000 and 2005 regulations.

The Department began its transition to change the 1982 rules in 2000 and finalized them in 2005. Transitional regulations governed the interim period. See 36 C.F.R § 219.35(a-b)(2000). The 2000 regulations no longer detailed the selection and monitoring of MIS, but rather established a new standard -- the "best available science in implementing . . . the current plan." 36 C.F.R. § 219.35(a). The 2000 rules applied the "best available science" standard, but allowed limited use of the 1982 rules during the transition period: "the responsible official may complete the amendment or revision process under the 1982 regulations," if, "as of November 9, 2000, a plan revision or amendment has been initiated under the 1982 planning regulations in effect prior to November 9, 2000," and if " a notice of availability of a draft environmental impact statement or an environmental assessment is published by May 9, 2001 in the Federal Register . . . ." 36 C.F.R. § 219.19(a-b)(2000).

4.      **UEC II.**

In UEC II, the Tenth Circuit did not reach new issues, but acknowledged and applied the

standard for MIS obligations under the 1982 Regulations that it announced in UEC I.  The concurring

opinion in UEC II recognized that the panel was not breaking new ground, but was only bound by

and following the precedent that the Tenth Circuit established in UEC I: "But for the intercession of

UEC I, I would affirm the district court [upholding the Forest Service's reliance on habitat

information alone for some MIS].  The obligations of stare decisis, however, compel me to concur

respectfully in the result today."   Amended UEC II, 439 F.3d 1184, 1197 (2006)(White, J.,

concurring).  As the Tenth Circuit stated in UEC II, UEC I resolved two issues: (i) "the regulations

anticipate application of § 219.19 to project level as well as plan level management actions"; and (ii)

the USFS must use "actual, quantitative population data" to meet MIS monitoring obligations under

36 C.F.R. § 219.19.  Amended UEC II, 421 F.3d at 1191 (quoting UEC I, 372 F.3d at 1225-1226).

In UEC II, the plaintiff challenged the legality of a timber sale decision that the USFS made

in October of 2001, raising, among other things, claims arising from alleged violations of the 1982

regulations.  See Amended UEC II, 421 F.3d at 1187.  The USFS initially argued, as it argues here,

that the 1982 regulations did not apply, but that an "interpretative rule" issued in September of 2004

controlled disposition of the case.  Pre-Amended UEC II, 421 F.3d 1105, 1110-11 (10th Cir. 2005).

The Tenth Circuit initially rejected the USFS' argument, for three reasons.  First, the Court of

Appeals found that the USFS had "exercised its discretion to apply the 1982 rule when issuing the

Decision Notice and Final Decision."  Id. at 1110.  Second, the Tenth Circuit held that the so-called

"interpretative rule" did not have "the force and effect of law," and that its earlier decision in UEC

I had already declared that timber sale decisions authorized pursuant to the 1982 regulations would

be held to the standards and the requirements of those regulations, and not to any other set of subsequently promulgated regulations.  Id. at 1111.  Third, the Tenth Circuit found that the underlying Forest Plan's "diversity provisions reflect the 1982 rules," and that it was therefore appropriate to apply the 1982 regulations in resolving the case.  Id.  The Tenth Circuit, however, amended its opinion in UEC II.  After the USFS "significantly and thankfully" conceded that it had waived any argument that the 2000 transition rules applied, the Court amended its decision and deleted its above reasoning and analysis in applying the 1982 regulations, and simply concluded that "[w]e review the Forest Service's obligations under the 1982 rule . . . ."  Amended UEC II, 439 F.3d at 1189-90.

### 5.   NEPA.

The Tenth Circuit has held that NEPA's purpose is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  Catron County Board of Commissioner v. U.S. Fish and Wildlife Service, 75 F.3d 1429, 1437 (10th Cir. 1996)(citing 40 C.F.R. 1500.1(c)).  While NEPA does not require agencies to elevate environmental concerns above other concerns, NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decision making process includes environmental concerns."  Utahns for Better Transportation, 305 F.3d at 1162.  "NEPA procedures . . . require agencies to take a 'hard look' at the environmental consequences of the proposed action."  Id. at 1163.

"[T]his 'hard look' at potential environmental impacts is accomplished through an EIS."  Citizens' Comm. to Save Our Canyons v. United States Forest Serv., 297 F.3d 1012, 1022 (10th Cir. 2002)(citations omitted).  An EIS "detail[s] the environmental impact of the action; unavoidable

adverse environmental effects; alternatives to the action; relationship between the short-term uses and long-term productivity of the affected environment; and irretrievable and irreversible commitments of resources should the action be implemented." Catron County Board of Commissioners, 75 F.3d at 1434 (citing 42 U.S.C. § 4332(2)(C)(i)-(v)).

## LAW REGARDING EXHAUSTION

"[W]here Congress specifically mandates, exhaustion is required." McCarthy v. Madigan, 503 U.S. 140, 144 (1992). "The Administrative Procedure Act requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court." Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 (citing 5 U.S.C. § 704). "[T]he exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA. But where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." Darby v. Cisneros, 509 U.S. 137, 153-54 (1993). Further, "[s]tatutes and regulations governing actions of the Forest Service reiterate the administrative exhaustion requirement." Id. (citing 7 U.S.C. § 6912(e), and 36 C.F.R. § 215.20).

7 U.S.C. § 6912 provides:

(e) Exhaustion of administrative appeals. Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against–

  (1) the Secretary;

  (2) the Department; or

  (3) an agency, office, officer, or employee of the Department.

Federal Courts have strictly applied the statutory exhaustion requirement when asked to review Department of Agriculture administrative proceedings.  "[T]he statutory provision mandating exhaustion contained in 7 U.S.C. § 6912(e) is explicit. . . .  There can be little doubt that Congress's intent, in enacting this statute, was to require plaintiffs to exhaust all administrative remedies before bringing suit in federal court." Bastek v. Federal Crop Insurance Corp., 145 F.3d 90, 94-95 (2d Cir. 1998).  The United States Court of Appeals for the Second Circuit, in Bastek v. Federal Crop Insurance Corp., held that "7 U.S.C. § 1912(e) unambiguously required plaintiffs to exhaust their administrative remedies before bringing suit, and their failure to do so deprived them of the opportunity to obtain relief in the district court." Id. at 95.

In Kleissler v. U.S. Forest Service, 183 F.3d 196 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit described the exhaustion process in claims brought against the USFS:

> It is abundantly clear by the plain language of the applicable statutes and regulations that the Forest Service must be given written notice of an objector's challenges.  Therefore, we will consider only those allegations and comments contained in written documentation and correspondence to the Forest Service.  Moreover, we hold that the claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court.  We are admonished that:
>
> "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553-54, 98 S. Ct. 1197, 1217, 55 L. Ed. 2d 460 (1978).

Id. at 202.  See Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 ("Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion

-24-

arguments on a case-by-case basis."). "The rationale underlying the exhaustion requirement is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area is given first shot at resolving a claimant's difficulties." Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 (citing Saulsbury Orchards & Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1195 (9th Cir. 1990)).

## ANALYSIS

The Plaintiffs challenge the USFS' approval of the A/C Projects on the Carson National Forest in New Mexico. The Plaintiffs' burden in establishing that the USFS' conclusions concerning environmental impacts of the A/C Projects were erroneous is particularly heavy. A deferential approach is appropriate here. The Plaintiffs have not established violations of NFMA or of NEPA. The Court will deny the Plaintiffs' appeal of the A/C Projects and will not enjoin the A/C Projects.

**I.    THE PLAINTIFFS HERE HAVE NOT SUFFICIENTLY EXHAUSTED THE ADMINISTRATIVE PROCESS FOR THEIR CLAIM THAT THE USFS FAILED TO APPLY THE 2000 TRANSITION RULES, THE PLAINTIFFS HAVE NOT SHOWN THAT THE A/C TIMBER SALE PROJECT IS INCONSISTENT WITH THE FOREST PLAN, AND THE USFS HAS COMPLIED WITH ITS STATUTORY OBLIGATIONS.**

The Plaintiffs contend that the USFS violated various provisions of NFMA in approving the A/C Projects. The Plaintiffs' Complaint alleges that the USFS' approval of the A/C timber sale project violates NFMA in three ways. First, the Plaintiffs assert that the A/C timber sale project is inconsistent with the Carson National Forest Plan, which the USFS adopted in September of 1986 to guide and constrain all forest management activities -- including timber sales. Second, the Plaintiffs assert that the A/C timber sale project violates the USFS' substantive statutory duty, pursuant to NFMA, to provide for diversity of wildlife on national forest lands. Third, the Plaintiffs allege that

the A/C timber sale project violates substantive and procedural duties imposed by the 1982 regulations implementing NFMA to monitor population trends of MIS in the project area, and to assure the maintenance of minimum viable populations of all wildlife species on national forest lands. The Court finds that the 2000 transition regulation rules apply in this case, but, the Plaintiffs have not exhausted the administrative process concerning the 2000 transition rules. The Court also finds that the USFS complied with its consistency obligations under NFMA, as well as with its NFMA substantive statutory obligations.

> **A.** **THE 2000 TRANSITION RULES APPLY, BUT THE PLAINTIFFS DID NOT EXHAUST THE ADMINISTRATIVE PROCESS FOR THEIR CLAIMS THAT THE 2000 RULES APPLY OR THAT THE USFS DID NOT APPLY THE "BEST AVAILABLE SCIENCE" STANDARD.**

The Court finds that the "best available science standard" applies pursuant to the 2000 transition rules, because the Record of Decision occurred on April 13, 2004, and because the Carson Forest Plan does not incorporate the 1982 regulations. The Court also concludes, however, that the Plaintiffs did not exhaust the administrative process for their claim that the 2000 transition rules apply, and for their claim that the USFS did not apply the 2000 transition rules or the "best available science" standard in the project planning. The Plaintiffs did not exhaust their NFMA regulatory claim.

> **1.** **The 2000 Transition Rules and the "Best Available Science" Standard Apply, and the 1982 Rules do not Apply.**

"Deciding whether the 1982 regulations apply to [a] Project, either of their own accord or by virtue of the Forest Plan, is important because the 1982 regulations and the 2000 transition provisions contain key differences governing species monitoring." UEC III, 443 F.3d 732, 744 (10th Cir. 2006). The Tenth Circuit in, UEC III, recognized the confusion that has occurred during the transition

period.  See id. at 745 ("To be sure, courts have expressed considerable confusion in applying the

2000 transition provisions.")(citations omitted).  The Tenth Circuit further explained the USFS'

attempt to clarify the confusion:

> In an attempt to address this confusion, the Forest Service issued an interpretative
> rule on September 29, 2004.  Introducing the rule, the Forest Service explained:  "It
> is clear that site-specific decisions entered into during the transition period are not to
> comply with the substantive provisions of the 2000 planning rule.  This interpretative
> rule clarifies that until a new final rule is promulgated, the transition provisions of the
> 2000 planning rule, as amended by the May 2002 interim final rule remain in effect .
> . ."  69 Fed. Reg. 58,955, 58,056 (Sept. 29, 2004).  The interpretative provision
> emphasized that "responsible officials consider the best available science in
> implementing national forest land management plans and, as appropriate, plan
> amendments."  Id.  As to the continuing vitality of the 1982 provisions:  The 1982
> planning rule may continue to be used only for plan amendments and revisions upon
> election of the responsible official.  Appropriate plan amendments and projects
> proposed during the transition period should be developed considering the best
> available science in accordance with 219.35 paragraph (a).  Id.  As we explained in
> UEC II, "the 2000 regulations rendered the 1982 rule inoperative for project-specific
> decisions made after November 9, 2000.  The interpretative rule stated that, during
> the transition period between November 2000 and promulgation of a final rule, the
> Forest Service should use the 'best available science' under § 219.35(a) for project
> decisions."  UEC II, 439 F.3d at 1189.

Id. at 745-746.

The Tenth Circuit, in UEC III, refused to apply the 1982 rules for two reasons: (i) the final

decision date for the project was well within the transition period; and (ii) the forest plan in question

did not adopt the 1982 regulations.  See id. at 747-748.  In UEC III, the Tenth Circuit noted that the

2004 interpretive rule was issued in September, 2004, and the authorization for the Seven Mile

Project was finalized in October, 2004.  The Tenth Circuit held that the 2004, and not the 1982, rules

applied, because the final decision on the Project was made after the Department issued the 2004

interpretative rule.  Id. at 747.  The 1982 rules therefore did not apply in UEC III of their own

accord.

-27-

The Tenth Circuit in Ecology Center, Inc. v. United States Forest Service, 451 F.3d 1183, 1191 (10th Cir. 2006), affirmed  that "the relevant date to consider is the date the final agency decision on the Project was made."  The Tenth Circuit, relying on UEC III, held that the "best available science" standard, pursuant to the 2000 transition rules, applied to a project decision, where the Forest Plan did not "explicitly reference or adopt § 219.19 of the 1982 rules, concerning the selection and monitoring of management indicator species," despite the fact that the record of decision occurred on March 27, 2003 -- before the 2004 interpretative rule was issued.  See id. at 1190-92.

The Tenth Circuit's decisions in UEC III and Ecology Center, Inc. v. United States Forest Service compel the Court to apply the "best available science" standard pursuant to the 2000 transition rules under these circumstances.  First, the record of decision here occurred on April 13, 2004.  Although this decision occurred before the 2004 interpretative rule came out, this decision occurred during the transition period, and after the date the decision of record in Ecology Center, Inc. v. United States Forest Service was issued -- March 27, 2003 -- where the Tenth Circuit found that the "best available science" standard applied pursuant to the 2000 transition rules, rather than the 1982 rules.  The Court does not see any meaningful distinction between the date of the record of decision here, and that in Ecology Center, Inc. v. United States Forest Service, which would lead to a different result.

The Plaintiffs argue that the Carson Forest Plan and the Forest Plan's Monitoring Plan adopt the 1982 rules because the Forest Plan states it "was developed in compliance with the [1982 version of] the NFMA regulations," and the Monitoring Plan uses language similar to the language found in § 219.19.  Plaintiff's Motion for Preliminary Injunction and Memorandum Brief in Support of Motion

for Preliminary Injunction at 13.  This contention does not meet the UEC III requirement that the

forest plan "explicitly reference or adopt § 219.19 or the 1982 rules." UEC III, 443 F.3d at 748.  The

Tenth Circuit, in UEC III, established a heavy burden to prove that a forest plan incorporates the

1982 rules.  See id.  While the Carson Forest Plan references the 1982 rules, it does not "explicitly

reference or adopt § 219.19 of the 1982 rules, concerning the selection and monitoring of

management indicator species."  Id..

Review of the Carson Forest Plan reveals no specific incorporation of § 219.19(29).   The

Carson Forest Plan states: "The planning principles in the NMFA regulations (36 CFR 219.1 (b))

were implemented throughout the process."  AR 000420.  This general language, according to UEC

III, is not enough to incorporate the entirety of the 1982 rules to the MIS.  In UEC III, the Tenth

Circuit found that the following was not sufficient to show that the Forest Plan incorporated the 1982

regulations such that they would apply to the site-specific project: (i) the Fishlake Forest Plan

"envision[ed] a species monitoring program for the Fishlake National Forest.  It identifie[d], for

example, several management indicator species and states in its 'Implementation' chapter that the

Forest Service will use 'population trends' for management indicator species monitoring" --

insufficient because it did not explicitly require that the Forest Service comply with the monitoring

requirements of the 1982 rules; and (ii) the Fishlake Forest Plan was "developed under implementing

regulations of . . . Title 36, Code of Federal Regulations, Part 219 . . . ."  UEC III, 443 F.3d at 748.

Here, the general language concerning § 219 in the Forest Plan, and the language found in the

Monitoring Plan concerning monitoring of MIS, is indistinguishable from that in UEC III -- the Forest

Plan never specifically incorporates or adopts § 219.19 or the 1982 regulations, and thus the Court

will apply the "best available science" standard.

2.    **The Plaintiffs did not Exhaust any Claims Concerning the "Best Available Science" Standard.**

The USFS contends that, pursuant to UEC III, the Plaintiffs have waived any argument that the USFS did not apply the 2000 transition regulations or the "best available science" standard. See Transcript of Hearing at 14:4-18:10, 21:11-22:9, 26:1-29:6 (taken July 20, 2006). The USFS also contends that the Plaintiffs failed to exhaust any argument concerning the 2000 transition regulations and "best available science" standard. See id. at 27:13-23.

The Plaintiffs do not dispute that they did not argue to the USFS, before they filed this case in federal court, that the 2000 transition rules apply. Rather, the Plaintiffs respond that it would be unfair to hold them to a waiver and exhaustion requirement because the USFS has consistently applied the 1982 regulations, and the Plaintiffs would have had no reason or notice to argue that the 2000 transitional rules apply. See id. at 45:19-47:20, 37:19-39:15. The Plaintiffs further contend that the USFS waited until the administrative process was complete to argue that the 2000 regulations applied. See id. The Plaintiffs also assert that the USFS framed the issues in the administrative process and should thus be held to them. See id.

The Plaintiffs further assert that, when the they filed their motion for preliminary injunction and elected to turn that motion into their opening brief on the merits, the law was clear that the 1982 regulations applied, and thus they had no reason to argue, before this Court, that the 2000 transition rules were applicable. See Plaintiffs' Submission of Relevant Chronology with Respect to Federal Defendant's "Waiver Issue," filed July 20, 2006 (Doc. 64). Finally, the Plaintiffs contend that they argued in their "opening brief," in great length that the "Forest Service's administrative record in this case entirely fails to mention or apply the standards of the 2000 transitional regulations." Id. at 3.

First, the Court disagrees that the Plaintiffs' "opening brief" contains a lengthy argument that the USFS' administrative record in this case entirely fails to mention or apply the standards of the 2000 transitional regulations.  The Court has reviewed the "opening brief" -- the motion for preliminary injunction and the reply to the response to the motion for preliminary injunction -- and finds no such argument.  The Plaintiffs consistently argue, in their "opening brief," that the 2000 transition rules do not apply and that the 1982 rules apply.  The Plaintiffs nowhere in their "opening brief" assert that the 2000 transition rules apply, or that the USFS did not apply the "best available science" standard.  It appears that the Plaintiffs are arguing that their contention, that the USFS applied the 1982 regulations in the planning of the A/C Projects, is the same as arguing that the USFS did not apply the "best available science" standard.  The Court does not see how arguing that the 1982 rules apply necessarily leads to the conclusion that the USFS did not apply the "best available science" standard.  In UEC III, the plaintiffs also argued that the 1982 rules applied.  The Tenth Circuit did not construe this argument as an argument that the 2000 transition rules did not apply. The Tenth Circuit instead found that the plaintiffs were not arguing that the "Forest Service failed to consider the best available science when it implemented" the project.  UEC III, 443 F.3d at 744-749. Similarly here, although the Plaintiffs argue that the 1982 rules apply, they did not argue that the USFS failed to use the "best available science."

The Plaintiffs' more forceful argument is that the controlling case law, at the time they filed their motion for preliminary injunction and reply and converted those motions to their "opening brief," gave them sufficient reason not to raise the argument that the "best available science" standard did not apply, and therefore it would be unfair to now find that they waived that argument.

The plaintiff in UEC II challenged the legality of a timber sale decision that the USFS made

in October of 2001, raising, among other things, claims arising from alleged violations of the 1982

regulations. See Utah Environmental Congress v. Bosworth (UEC II), 421 F.3d 1105, 1108-11 (10th

Cir. 2005), rev'd by UEC II, 439 F.3d 1184.  The USFS argued, as it argues here, that the 1982

regulations did not apply, but that an "interpretative rule" issued in September of 2004 controlled

disposition of the case.  The Tenth Circuit initially rejected the USFS' argument, for three reasons.

First, the court found that the USFS had "exercised its discretion to apply the 1982 rule when issuing

the Decision Notice and Final Decision," and at oral argument stated that it '"elected to apply the

1982 rule when it approved the Project."  Pre-Amended UEC II 421 F.3d at 1110-11.  Second, the

Tenth Circuit held that the so-called "interpretative rule" did not have "the force and effect of law,"

and that its earlier decision in UEC I had already declared that timber sale decisions authorized

pursuant to the 1982 regulations would be held to the standards and the requirements of those

regulations, and not to any other set of subsequently promulgated regulations.  Id. at 1111.  Third,

the Tenth Circuit found that the underlying Forest Plan's "diversity provisions reflect the 1982 rules,"

and that it was therefore appropriate to apply the 1982 regulations in resolving the case.  Id.

Subsequently, the Tenth Circuit issued a revised opinion -- Amended UEC II -- and deleted

those portions of the opinion where it based its rationale for finding that the 1982 rules applied.

Compare Pre-Amended UEC II at 1110-11, with Amended UEC II at 1189-90.  Instead, the Tenth

Circuit noted that the USFS had conceded that it waived any argument that the transition rules

applied.  Later, the Tenth Circuit issued UEC III and Ecology Center v. United States Forest Service,

which clarified that in the case before this Court the 2000 transition rules apply and the 1982 rules

do not apply.  Thus, for a period of time -- from August 19, 2005 to February 4, 2006 -- the Plaintiffs

here were operating under controlling precedent that appeared to compel this Court to find that the

1982 rules applied.  Under those circumstances, there was no apparent reason for the Plaintiffs to argue that the 2000 rules applied, and that the USFS failed to use the "best available science" standard in implementing the project during that period of time.  Because the Plaintiffs were operating under precedent that has since changed, the Court does not believe that they waived their argument.

The Court does conclude, however, that the Plaintiffs did not exhaust their claims that the 2000 transition regulations apply and that the USFS did not apply the "best available science" standard.  Although there was controlling precedent -- Pre-Amended UEC II -- during the briefing in this litigation that the Court believes controls on the waiver issue, the Plaintiffs have not pointed to nor argued that there was any similarly controlling precedent during the relevant administrative process time frame; the Plaintiffs' final appeal was filed on July 12, 2004.  The Court also notes that exhaustion here is mandatory.  The Plaintiffs were required to exhaust any claims that they had against the USFS before bringing suit in federal court.  See McCarthy v. Madigan, 503 U.S. at 144. See also Darby v. Cisneros, 509 U.S. at 153-54; 7 U.S.C. § 6912.  The USFS was entitled to receive "written notice of [the Plaintiff's] challenges," and the Court may only "consider those allegations and comments contained in written documentation and correspondence to the Forest Service," and the claims brought before the agency must "be so similar that the [Court] can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised . . . ." Kleissler v. U.S. Forest Service, 183 F.3d at 202.

As the Tenth Circuit noted in UEC III, the 1982 rules and the 2000 transition rules are distinct:

> Deciding whether the 1982 regulations apply to the Project, either of their own accord or by virtue of the Forest Plan, is important because the 1982 regulations and the 2000 transition provisions contain key differences governing species monitoring.  The

> 1982 rules, for example, require the Forest Service to monitor the "population trends of the management indicator species" and determine "relationships to habitat changes." 36 C.F.R. § 219.19(a)(6). And we have held that these obligations apply to "project level as well as plan level management actions." UEC I, 372 F.3d at 1225. Conversely, the 2000 transition provisions contain no such explicit language governing monitoring but merely require "the responsible official [to] consider the best available science in implementing" a forest plan. 36 C.F.R. § 219.35(a), (d) (2001); 65 Fed. Reg. 67,514, 67,579 (Nov. 9, 2000). See generally [UEC II], 439 F.3d 1184, 1190 (10th Cir. 2006)(quoting Forest Watch v. U.S. Forest Serv., 410 F.3d 115, 117 (2d Cir. 2005), for the proposition that "the standards of the 1982 Rules and the 2000 Transitional Rule are-at least-distinct . . . .").

UEC III, 443 F.3d at 744-745.  Thus, bringing a claim that the 1982 rules were not appropriately applied is not sufficient to give an agency notice that the 2000 transition rules either should have been applied and were not, or that the 2000 transition rules were applied incorrectly.  If the Plaintiffs now want to argue that the 2000 transition rules apply, and that the agency did not either (i) apply the 2000 transition rules at all, or (ii) did not apply the 2000 transition rules correctly, they were required to bring such a claim before the agency in the administrative process, "to ensure that the agency possessed of the most expertise in an area be given first shot at resolving" the complaint, Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965, and that the agency "had an opportunity to consider and decide, the same claims now raised in federal court," Kleissler v. U.S. Forest Service, 183 F.3d at 202.

The Plaintiffs did not argue in the administrative process either that the 2000 transition rules applied, or that the USFS did not use the "best available science" standard.  See Forest Guardians' Brief in Response to the Court's Concern Regarding Exhaustion at 6, filed August 10, 2006 (Doc. 66)("Forest Guardians acknowledges [sic] that its administrative appeal did not raise the issue that the Forest Service failed to apply the 2000 transitional regulations during the administrative process for the Agua/Caballos timber sale.").  The Plaintiffs contend that the USFS framed the issue in terms

of the 1982 regulations by implementing the 1982 regulations for the project, and that it would now be unfair for the Court to hold that the Plaintiffs did not exhaust concerning the 2000 transition regulations.  The Plaintiffs argue that it would have been impossible for them to foresee that the 2000 transition rules and the "best available science" standard apply because the agency did not issue the 2004 interpretive rule until after the administrative process was complete.[2]  The Plaintiffs rely on Bowen v. City of New York, 476 U.S. 467 (1986), for its contention.  See Forest Guardians' Brief in Response to the Court's Concern Regarding Exhaustion at 6-7.

The Court disagrees with the Plaintiffs' contention and does not believe that Bowen v. City of New York is controlling under these circumstances.  In Bowen v. City of New York, the plaintiffs brought a class action challenging an internal policy of the Secretary of Health and Human Services that had the effect of denying disability benefits to numerous claimants who may have been entitled to them.  See 476 U.S. at 469.  By the time the lawsuit was filed, a large number of class members were precluded from the administrative appeals process since the expiration of the 60-day time limit barred further administrative review.  See id. at 482.  The Supreme Court held that exhaustion was

---

[2] The Plaintiffs also contend that the USFS assumed, and induced others to assume, that the 1982 rules applied until the 2004 interpretative rule was issued.  The USFS responds that this contention is false.  The USFS asserts that, in the context of litigation, it may be necessary for parties to assume matters where resolution of such assumed matters is not necessary for resolution of the case, and that '[n]owhere . . . does the petition for rehearing in UEC II suggest that the assumption for purposes of district court proceedings in UEC II was the position or the assumption of the agency as a whole prior to the promulgation of the 2004 Interpretative Rule."  Federal Defendants' Brief on Exhaustion, filed August 15, 2006 (Doc. 68).  The USFS further notes that the Petition for Rehearing in UEC II emphasized that the intent of the 2004 rule was to "'clarify the application of the transition provisions of the 2000 rule and explain that the 2000 rule rendered the 1982 rule inoperative with respect to site-specific decisions made after November 9, 2000."  Id. (quoting Petition for Rehearing at 5).  The Court need not resolve this conflict, because, as explained below in more detail, even if the USFS was operating under the incorrect assumption that the 1982 rules applied, the Plaintiffs had sufficient notice to raise the issue in the administrative process.

not required: (i) where plaintiffs "did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to Court challenge"; (ii) where the "Government's secretive conduct prevents plaintiffs from knowing of a violation of rights"; and (iii) where "the Government's clandestine policy was uncovered only in the course of [] litigation." Id. at 480-482.  The Supreme Court found that, "[s]ince members of the class could not attack a policy they could not be aware existed . . . it would be unfair to penalize these claimants for not exhausting under these circumstances." Id. at 482 (internal citations and quotations omitted).

The situation here is different.  While the plaintiffs in Bowen v. City of New York had no way of knowing that the secret policy even existed, the 2000 transition rules were available to the public.  The transition rule at issue here was not hidden or kept secret from the Plaintiffs.  The Plaintiffs contend that they had no way of knowing that the "best available science" standard applied, because the 2004 interpretative rule stating that such standard was mandatory was not released until after the administrative process was complete and after they had any opportunity to bring the claim before the agency in the administrative proceeding.  See Forest Guardians' Brief in Response to the Court's Concern Regarding Exhaustion at 8-9.  The Court disagrees.

The USFS applied the 1982 regulations to the A/C Projects, but that in no way precluded the Plaintiffs from reviewing the regulations and informing the agency that they had applied the wrong rules and standards.  The 2000 transition rules state: "The transition period begins on November 9, 2000 and ends upon the completion of the revision process (219.9) for each unit of the National Forest System.  During the transition period, the responsible official must consider the best available science in implementing and, if appropriate, amending the current plan." See 36 C.F.R. § 219.35(a)

(November 9, 2000).  The rule further states:

> If, as of NOVEMBER 9, 2000, a plan revision or amendment has been initiated under the 1982 planning regulations in effect prior to November 9, 2000 (See CFR part 219, revised as of July 1, 2000.) and if a notice of availability of a draft environmental impact statement or an environmental assessment is published by May 9, 2001 in the Federal Register, the responsible official may complete the amendment or revision process under the 1982 regulations or adjust the process to conform to the provisions of this subpart.

See id. § 219.35(b).

After reviewing the transition rules, the Court concludes that the Plaintiffs are incorrect when they contend that the "best available science" standard "did not even come into existence until the Forest Service promulgated the September 2004 interpretative rule clarifying for the first time" that the standard applied.  The rule itself states that the "best available science" must be considered in implementation.  See 36 C.F.R. § 219.35(b).  Although there may have been some confusion and contention whether the 1982 regulations or the 2000 transition regulations applied for site-specific projects that were planned and approved pursuant to the 1982 regulations, the plain language of the 2000 regulation, at minimum, brought the issue into existence.

The Tenth Circuit's decision in UEC III is helpful on the question whether the Plaintiffs should have been aware of the issue.  The Tenth Circuit stated:

> In conducting our analysis, then, we are guided primarily by the plain meaning of the 2000 transition provisions as well as the Forest Service's interpretative rule. However, before looking at this language, it is important to distinguish the terms used to define a forest plan generally from those used to define specific projects implemented under a forest plan.  This distinction is crucial because the 2000 transition provisions endorse different standards for forest plans generally and individual projects in particular.  Thus, when the Forest Service employs the term "plan," as in "plan amendments and revisions," "plan" refers to forest plans generally. On the other hand, when the Forest Service uses the term "project" or "implementing the plan," the term refers to individual projects.

-37-

With this distinction in mind, we turn to the text.  The transition provisions mandate that "during the transition period, the responsible official must consider the best available science in implementing . . . the current plan." 36 C.F.R. § 219.35(a) (emphasis added); cf. § 219.35(b) ("If, as of November 9, 2000, a plan revision or amendment has been initiated under the 1982 planning regulations . . . the responsible official may complete the amendment or revision process under the 1982 regulations") (emphasis added).  This language is the sole direction to the Forest Service regarding project-level actions.  Nonetheless, it leaves little doubt that the Forest Service is limited to consideration of the best available science when approving a project during the transition period.

443 F.3d at 746-747.  The Tenth Circuit believed that the plain language of the regulation left "little doubt" that the "best available science" standard applied.  Id. at 747.  Thus, the Court concludes that the plain language of the regulation was sufficient to bring the issue and argument to the attention of the Plaintiffs before the administrative process concluded and before the agency issued the 2004 interpretative rule.[3]  That the Plaintiffs misinterpreted a regulation, or that the administrative agency misapplied a regulation, does not mean that exhaustion is excused.

Plaintiffs bring claims every day arguing that an agency misapplied its rules or violated the law.  If the Court found that a plaintiff did not have to exhaust whenever an agency misapplied a rule or framed the issue incorrectly, exhaustion would rarely be required.  Such an exception would swallow the exhaustion rule; exhaustion would be excused any time an agency applied the wrong standard, and a party opposing the agency action could avoid exhaustion by either ignoring or failing to adequately research and bring to the agency's attention what the  appropriate standard should be.

---

[3]  The Court notes that the Plaintiffs have argued that "there is no evidence in the Administrative Record that the USFS applied the 'best available science' standard and that "there is absolutely no mention of the 'best available science' standard in the Administrative Record." Plaintiffs' Reply Brief on the Merits at 12-13.  The USFS states, however, in its Record of Decision, that the "monitoring plan, like the EIS, is based on the best available scientific information at this time, some of which is referenced in the EIS."  AR 012795.  This statement also should have put the Plaintiffs on notice that the "best available science" standard was an issue or could have been raised.

Such an exception would frustrate the statutory mandate to exhaust.[4]

The administrative process gives the agency notice that it is doing something wrong or is not complying with the law in some way, and gives the agency an opportunity to correct any problems with the proposed agency action. The exhaustion requirement requires the party opposing the agency action inform the agency how the agency is not complying with the law. The Court does not believe that requiring a party opposing agency action to give the agency notice when the agency is applying the wrong law or standard is too great of a burden, especially where Congress has mandated exhaustion, and the plain language of the regulation gives notice of the issue. The Plaintiffs failed to exhaust the administrative process, and because exhaustion of the administrative process is mandatory, the Court will not address the merits of the Plaintiffs' claims that the USFS did not apply the "best available science" standard.

> **B.      THE PLAINTIFFS HAVE NOT SHOWN THAT THE FOREST PLAN'S MONITORING PLAN'S MIS MONITORING REQUIREMENTS ARE A CONDITION PRECEDENT TO APPROVAL OF CITE SPECIFIC PROJECTS, AND THE FOREST PLAN DOES NOT REQUIRE THAT THE ABERT'S SQUIRREL BE MAINTAINED AT POPULATIONS "GREATLY EXCEEDING MINIMUM VIABLE POPULATIONS."**

The Court finds that the Monitoring Plan's MIS monitoring requirements do not constitute a condition precedent to project approval and thus the deficient monitoring claim is not cognizable. The Court also concludes that the Carson Forest Plan does not require that the Abert's squirrel be

---

[4]  The Plaintiffs also contend that the Tenth Circuit's decision in <u>Ecology Center v. U.S. Forest Service</u> mandates that this Court hold that, because the USFS applied the 1982 rules in analyzing the A/C Projects, the decision to approve the Projects was arbitrary and capricious and must be vacated. <u>See</u> Forest Guardian's Brief in Response to Court's Concern Regarding Exhaustion at 1-2. The Court does not believe, however, that Tenth Circuit precedent requires such an outcome. Nothing in <u>Ecology Center v. U.S. Forest Service</u> indicates the parties argued the issue or that the Tenth Circuit decided the issue of exhaustion.

maintained at populations "greatly exceeding minimum viable populations."

1. **The Carson Forest Plan's Monitoring Plan's MIS Monitoring Requirements are not a Condition Precedent to Project Approval.**

The Plaintiffs argue that the plans for the A/C timber sale project are inconsistent with the Carson National Forest Plan in two ways and, therefore, the project violates NFMA. See 16 U.S.C. §1604(1).  First, the Plaintiffs argue that the USFS has not complied with the methodologies and Monitoring Plan's requirements, which the Forest Plan incorporates.  See Motion for Preliminary Injunction at 18-19.  Second, the Plaintiffs argue that all the evidence indicates that the population of Abert's squirrel on the Carson National Forest is far below that level of population that the USFS stated to be the minimum viable population in the Analysis of the Management Situation ("AMS"), while the "Carson National Forest Plan, as required by the plain language of NFMA, also imposes a substantive obligation on the USFS to assure that populations of MIS on the Carson National Forest are conserved 'at levels greatly exceeding minimum viable populations.'" Id. at 10 (citing AR 011562).

The Plaintiffs would have the Court hold that the USFS violated NFMA's consistency provision by not complying with the Forest Plan's Monitoring Plan requirements.  The Court concludes, pursuant to UEC III, that the project's approval here was not conditioned upon the fulfillment of certain monitoring obligations, and therefore, "[w]ithout such a relationship, a claim of deficient monitoring simply is not cognizable."  UEC III, 443 F.3d at 750.

The Monitoring Plan consists of its own separate section of the Forest Plan. See AR 000600-000649.  The Court has carefully reviewed the Forest Plan's Monitoring Plan and finds nothing in the Monitoring Plan that conditions a project's approval on fulfilling certain requirements of the

Monitoring Plan -- specifically here, there is no such language in the Monitoring Plan concerning the five years of baseline data for MIS or other monitoring methodologies.  Indeed, the introduction of the Monitoring Plan provides: "The purpose of monitoring and evaluating the implementation of the Forest Plan is to inform the decision maker of the progress toward achieving the goals, objectives, and standards and guidelines."  AR 000600.  This language indicates that the Monitoring Plan's purpose is to help the USFS achieve its goals in the Forest Plan and does not indicate a condition precedent to implementing a site-specific project.

The Forest Plan also provides:

It should be realized that monitoring of wildlife resources on such a scale as proposed is at best tentative and exploratory.  State-of-the-art knowledge indicates it is a suitable system at the present time, but it must be noted that modifications may be needed within the planning period to better indicate the effects of National Forest management activities on the Carson's wildlife resources.

AR 000609.  See AR 000428 ("Activities, outputs, and standards will be monitored and evaluated according to the Monitoring Plan . . . .  The Monitoring Plan specifies the criteria for evaluating the need for amendments or revisions to the Plan.").

The Forest Plan's structure also indicates that the Monitoring Plan was never meant to be a condition precedent to approval of site-specific projects.  The Forest Plan was adopted in 1986, and at that time the USFS planned timber projects going forward beginning in 1987.  See AR 000597-000599.  If the USFS had intended the Monitoring Plan requirements to be condition precedents to site-specific project approval, then the USFS would have planned on being non-compliant and in violation of NFMA's consistency requirements the year after the Forest Plan was adopted, because it would have been impossible at that point to have five years of baseline MIS monitoring.  Such an intention would have been inconsistent with the way the Forest Plan was set up.

-41-

The Plaintiffs argue that the language in UEC III concerning enforcement of the Monitoring Plan requirements is not controlling, because the Tenth Circuit in UEC III addressed projects approved under the categorical approach. See Transcript of Hearing at 46:8-47:6 (taken July 20, 2006). The Court believes that the Tenth Circuit's holding in UEC III, concerning enforcement of a Forest Plan's Monitoring Plan, was not solely dependant on the site-specific project being reviewed under the categorical approach. Although the Tenth Circuit applied the general rule concerning when a monitoring plan's requirements are enforceable to a categorically excluded project, and was careful to distinguish analysis of "species which trigger application of extraordinary circumstances under a categorical approach," UEC III, 443 F.3d at 751 n.14, the Court did not indicate that the rule only applied to categorically excluded projects. The Tenth Circuit first laid out the general rule:

> Ordinarily, a forest plan's forest-wide monitoring program is not subject to judicial review because it does not constitute final agency action. . . . In limited circumstances, however, we may review a monitoring program to the extent it bears on the approval of a particular project. . . . In other words, if a project's approval is conditioned upon the fulfillment of certain monitoring obligations, a plaintiff may bring a claim of deficient monitoring. Without such a relationship, a claim of deficient monitoring simply is not cognizable.

Id. at 750 (citations omitted). The Tenth Circuit then went on to apply this general rule to the categorically excluded project. The Tenth Circuit did not indicate that the general rule applied only to categorically excluded projects.[5]

Finally, the result in UEC II is distinguishable. In UEC II, the Tenth Circuit held that the USFS did not satisfy "the monitoring provisions of the Forest Plan with respect to the Mexican

---

[5] The Plaintiffs cite to Environmental Protection Information Center v. Blackwell, 389 F.3d F.Supp.2d 1174, 1211 (N.D. Cal. 2004), for the proposition that Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, applies only to failure to act claims under 5 U.S.C. § 706(1). The Tenth Circuit, however, has subsequently applied Norton v. Southern Utah Wilderness' reasoning to approval of cite-specific projects. See UEC III, 443 F.3d at 749-750.

spotted owl." <u>UEC II</u>, 439 F.3d at 1194.  The Tenth Circuit stated that the "[Fishlake] Forest Plan mandates that the Forest Service annually monitor by visual reconnaissance any threatened, endangered, and sensitive animals in the Fishlake National Forest to ensure 'no decrease attributed to management activities.'" <u>Id.</u> (quoting Fishlake Forest Plan at V-6).  The section of the Fishlake Forest Plan that the Tenth Circuit relied on and quoted is different than the Carson National Forest Plan's Monitoring Plan concerning MIS, because the Carson National Forest Monitoring Plan does not mandate MIS monitoring as a condition precedent where the Fishlake Forest Plan required certain monitoring of the Mexican spotted owl.  The Fishlake Forest Plan's Monitoring Plan contained "standards" directly tied to the monitoring of certain species, including the Mexican spotted owl, that were applicable to project-level decisions.  <u>See</u> Fishlake Monitoring Plan at Table V-I (attached as Exhibit B to Federal Defendants' Notice of Supplemental Authority, filed March 3, 2006 (Doc. 50)). The term "standards" is defined in the Fishlake Forest Monitoring Plan as "[a]cceptable limits indicating no need for further planning action – a statement describing the tolerance limits within which actual performance can vary from predicted performance.  When these limits are exceeded, further evaluation is triggered."  Fishlake Monitoring Plan at V-3 (attached as Exhibit 1 to Plaintiffs' Response to Federal Defendant's Notice of Supplemental Authority, filed March 21, 2006 (Doc. 52)). The language that the Tenth Circuit quoted in <u>UEC II</u>, is directly tied to the specific monitoring of the Mexican spotted owl, as a "standard."  The Carson National Forest Plan's Monitoring Plan contains no such "standards" section directly tying monitoring of MIS to site-specific project approval, and the Court does not believe that any other portion of the Monitoring Plan contains language that would make fulfillment of the Monitoring Plan's requirements a condition precedent to site-specific project approval.

The Carson Monitoring Plan provides that "[t]he purpose of monitoring and evaluating the implementation of the Forest Plan is to inform the decision maker of the progress towards achieving the goals, objectives, and standards and guidelines." AR 000600. It further states, similar to the Fishlake Monitoring Plan: "Monitoring will determine . . . if standards are being followed." Compare AR 000600 with Fishlake Monitoring Plan at V-2. This statement does not indicate that implementation of the plan is conditioned on the monitoring requirements, or that the monitoring requirements equate to the standards of the Carson Forest Plan, but rather that the monitoring requirements will help inform the decision maker of progress towards objectives, goals, standards, and guidelines, and will inform the decision maker whether the standards and prescriptions -- provided in Sections C and D of the Carson Forest Plan -- are being followed. Thus, the Monitoring Plan itself is not a prescription or standard, but rather gives information to the decision maker on progress towards those standards. This provision does not appear to the Court to create a condition precedent to site-specific approval of projects, nor does it tie specific monitoring of MIS to project approval as a "standard," in the same manner the Fishlake Monitoring Plan tied monitoring of the Mexican spotted owl as a "standard" to project approval. Compare AR 000600 with Fishlake Monitoring Plan at Table V-I.

The Plaintiffs argue that the term "standards" as used in Table V-I in the Fishlake Forest Plan is distinct from the use of the term in the other provisions of that Plan and has a different meaning. Such an interpretation would not be logical and would give no effect to the Fishlake Monitoring Plan's definition section. The term "standards" provided in the table is described as "acceptable limits indicating no need for further planning action." Fishlake Monitoring Plan at Table V-I. The same definition appears in the Monitoring Plan's definition section. See Fishlake Monitoring Plan at V-3.

-44-

Because nothing in the Forest Plan or Monitoring Plan indicates that a project's approval is conditioned upon the fulfillment of certain monitoring obligations, and because the Forest Plan and the Monitoring plan contain indications that the Monitoring Plan is not a condition precedent, the Plaintiffs' claim of deficient monitoring is not cognizable.

2.  **The Forest Plan Does Not Require That the Abert's Squirrel be Maintained at Populations "Greatly Exceeding Minimum Viable Populations."**

The Plaintiffs next contend that the Forest Plan requires that the Abert's squirrel be maintained at populations "greatly exceeding minimum viable populations." Motion for Preliminary Injunction at 19.[6] The Forest Plan, however, does not so require. The Plaintiffs cite to the MISA for their contention. The MISA states: "The FEIS determined that MIS would be managed at levels greatly exceeding viable populations at the projected harvest levels. The actual harvest level has averaged only about one third of the projected, therefore it is assumed that the Forest is well within its ability to maintain viable populations for MIS." AR 011562. The MISA also provides: "Populations of all indicator species, with the possible exception of certain rare animals, will be managed at levels greatly exceeding minimum viable populations." Id. Neither the MISA nor the FEIS is the Forest Plan, although the FEIS is a companion document to the Forest Plan. See AR 000420. Plaintiffs cite to no case law that holds that a MISA or FEIS is part of the Forest Plan, or that projects must be consistent with the MISA or the FEIS. Because NFMA requires that projects be consistent with Forest Plans, and a MISA and a FEIS are not Forest Plans, the Court concludes

---

[6] It appears that the Plaintiffs have abandoned this "greatly exceeding" argument. The Plaintiffs made this contention in their preliminary injunction motion. See Motion for Preliminary Injunction at 19. The Defendants' responded by arguing that the statement was not contained in the Forest Plan, but rather was found in the FEIS as a 200 year-projected goal. The Plaintiffs have not further argued this issue nor have they responded to the Defendants' contention.

-45-

that the Forest Plan does not require the USFS to maintain the Abert's squirrel at populations "greatly exceeding minimum viable populations."   The Plaintiffs argue only that the Forest Plan required maintenance of the Abert's squirrel at populations "greatly exceeding minimum viable populations," and cite only to the MISA for such a proposition, but, to the extent that the Forest Plan requires that the USFS maintain the Abert's squirrel at minimum viable populations, the Court will address such issue in the following section on the Plaintiffs' substantive NFMA claim.

### C.   THE PLAINTIFFS HAVE NOT SHOWN THAT THE USFS FAILED TO COMPLY WITH ITS SUBSTANTIVE STATUTORY OBLIGATIONS.

NFMA imposes substantive duties on the USFS, "including the duty to 'provide for diversity of plant and animal communities.'"  Envtl. Prot. Info. Ctr. v. United States Forest Serv., 451 F.3d 1005, 1017 (9th Cir. 2006)( quoting 16 U.S.C. § 1604(g)(3)(B)).  The Plaintiffs argue that the USFS "is failing in its duty," imposed by NFMA, "to assure the maintenance of viable populations" of the Abert's squirrel.[7]  Motion for Preliminary Injunction at 24.  The Plaintiffs contend that the available information shows that the population of the Abert's squirrel is "especially imperiled."  The Plaintiffs assert that the USFS is violating NFMA's substantive statutory provisions requiring the USFS to maintain minimum viable populations of the Abert's squirrel because population levels for the Abert's squirrel are below the USFS' minimum viable population threshold and are declining, while the A/C timber sale project calls for the destruction of additional squirrel habitat, which will lead to further declines in population.  See Motion for Preliminary Injunction at 31.  Because the Court finds that

---

[7] The Court notes that some of the Plaintiffs' argument concerning their substantive statutory claim under NFMA is discussed in combination with their argument supporting their NFMA regulatory claim and consistency claim as to MIS monitoring.  See Motion for Preliminary Injunction at 24.  The Plaintiffs, however, have developed and cited to the record for their NFMA substantive statutory and consistency claims concerning "minimum viable populations," only for the Abert's squirrel.

the USFS was rational in concluding that the planned project will create a more diverse habitat for the Abert's squirrel, and will provide higher quality habitat and better foraging opportunities, the Court concludes that the USFS did not violate NMFA's substantive statutory requirement concerning the Abert's squirrel.

The Plaintiffs make several assertions in their argument that the USFS is violating its duty to maintain a minimum viable population of the Abert's squirrel. The Plaintiffs first assert that the USFS has set the minimum viable population for the Abert's squirrel at one squirrel to every 6 to 16 acres. See Motion for Preliminary Injunction at 24. The Plaintiffs rely on the AMS for this contention. Id. at 24 (citing AMS (attached as Exhibit 2 to Motion for Preliminary Injunction). The Plaintiffs contend that Dr. Frey's 2003 report -- establishing squirrel densities at 0 to .2 per acre, see AR 012066 -- and 2004 report -- finding that the Abert's squirrel density in 2004 was lower than in 2003, see AR 013012 -- show that squirrel density was lower in 2003 and 2004 than the minimum viable population set by the USFS in the AMS. See Motion for Preliminary Injunction at 25.

The Plaintiffs next argue that the USFS also stated in the AMS that 77,000 acres of essential habitat are needed to support a viable population of Abert's squirrel. See Motion for Preliminary Injunction at 24 (citing AMS). The Plaintiffs further contend that, although only 53,200 acres of essential habitat existed for the Abert's squirrel when the AMS was prepared, the USFS has since that time authorized commercial timber sales in approximately 7% of the Abert's squirrel habitat on the Carson National Forest, 65% of which was shifted from late to early seral conditions -- rendering the area unsuitable for squirrel habitat. See id. at 24-25 (citing AR 000857).

The USFS responds that the AMS identifies numbers that would represent a viable population for the Abert's squirrel and does not purport to represent a minimum viable population. The USFS

further asserts that Dr. Frey, in her 2003 report, noted that "typical levels" of Abert's squirrel populations densities are one squirrel per 20-40 acres -- a lower density range than one squirrel per 6-16 acres that the AMS describes.  Federal Defendants' Response Brief on the Merits at 15 (quoting AR 012074).

The USFS also responds that the "Plaintiffs' conclusory suggestion that recent timber practices on the Carson National Forest are decreasing habitat for the Abert's squirrel . . . is at odds" with record evidence.  Federal Defendants' Response Brief on the Merits at 15.  The USFS points to the fact that suitable habitat on the Forest has increased from 53,220 in 1986 to 63,190 acres in 2002 -- almost a 20% increase.[8]  See id. (citing AR 011585).

Regardless whether the minimum viable population of Abert's squirrel is one squirrel every 20-40 acres, or one squirrel every 6-16 acres, Dr. Frey's report shows that the Abert's squirrel density is below either asserted viable population, and that the population had a severe decrease

---

[8] The parties argue whether the Abert's squirrel population crashed as a result of drought and past logging practices, as well as what logging practices were responsible for the crash.  See Motion for Preliminary Injunction at 26; Federal Defendants' Response Brief on the Merits at 23.  The parties also argue whether the Abert's squirrel population is stable, or in an upward or downward trend.  See Motion for Preliminary Injunction at 26-27; Federal Defendants' Response Brief on the Merits at 22-23.  The Court need not decide these issues, but rather the Court has to decide whether the USFS was rational when it concluded that the A/C Projects will benefit the Abert's squirrel habitation and foraging.  It does appear, however, that Dr. Frey found that the drought in combination with historical logging practices on the forest appeared to cause the crash in population.  See AR 013025.  Additionally, the MIS Assessment's conclusion that the squirrel population is stable is not necessarily inconsistent with Dr. Frey's report that the population has crashed, in light of the biologists' conclusion that the "'Abert's squirrel is a survivor and will persist as a species, although perhaps in reduced numbers' and that the squirrel have shown the ability to thrive in sparse populations and to emigrate considerable distances to successfully establish new stable populations."  AR 012953 (quoting James O. Keith, The Abert's squirrel (Sciurus aberti): a technical conservation assessment, Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project, 25 August 2003).

starting in 2002.  See AR 012066-012067.  This conclusion, however, is not dispositive.  Whether

the population trend for the Abert's squirrel is up, down, stable, or above or below viability, the

Plaintiffs have not shown the Court that the A/C Projects will have an adverse effect on the Abert's

squirrel population in the face of contrary evidence from the record.

The Plaintiffs equate, without support from an expert or from the record, any harvesting of

trees with destruction of species' habitat and population.  The A/C Projects, however, were designed

to benefit the squirrel and to improve its habitat and population numbers.  In the May 2003 MIS

Assessment for the Carson National Forest, the USFS biologists collected and assessed information

on the Abert's squirrel.  See generally AR 011582-011592.  The Assessment first describes the

habitat the Abert's squirrel uses.  See AR 011582 (noting that the habitat occurs "sporadically

throughout the Southwest").  It then discusses management activities that may beneficially and

adversely affect the Abert's squirrel.  See AR 011583 (noting heavy logging, long term fire

suppression, and overstory removal prescriptions and wildfire as negative activities, while thinning,

prescribed fire and low intensity wild fire are positive activities).  It also discusses the VSS stages (3,

4, 5, and 6) that are believed to provide the best habitat conditions.  See AR 011584.

The biologists state that "[i]ndiscriminate logging can degrade the Abert's squirrel habitat."

AR 011586.  They also state that "[t]he present dominance of mid-seral conditions in ponderosa pine

relate primarily to cumulative effects of historic heavy harvesting, such as the railroad logging early

in the 20th century and fire suppression."  Id.  They conclude: "As a result, the current habitat

condition for this species is poor to fair, but in a slight upward trend."  Id.  The biologists then note

that "[r]ecent changes in management practices on the Forest place[] more emphasis on thinning and

prescribed burning, which will increase desired habitat."  Id.  The biologists also state that

"[m]anagement practices of thinning from below and group selections across the Forest enhances

Abert's squirrel habitat that in turn should assure its survival."  AR 011587.

Dr. Frey's report also supports the conclusion that the A/C Projects will benefit the Abert's

squirrel habitat.  Although Dr. Frey found that there was no correlation between squirrel occurrence

and general stand data that the USFS maintained, she also noted that "[v]ariation in habitat

characteristics is known to influence squirrel densities," and that "habitat should consist of a

combination of tree age classes, with groupings, size, and density that provide all habitat

components."[9]  AR 012075-012076.

Further, the A/C Projects set aside the highest quality habitat for the Abert's squirrel as old

growth -- no logging will occur in these areas.  See AR 012952.  Finally, the Record of Decision

_____

[9] The Plaintiffs note that "[Dr. Frey] stated '[p]oor seed production can result from logging that results in younger and typically denser trees' and that logging can reduce canopy closure and tree basal area, which can result in a decrease in [truffles -- a key food source]."  Motion for Preliminary Injunction at 26 (quoting AR 012075).  The Plaintiffs also note that "[Dr. Frey] also notes that timber sales are likely partly responsible for the decline."  Id.  These statements do not refute, and are not inconsistent with, the USFS' conclusion that recent management practices of thinning from below and group selections across the Forest enhances the Abert's squirrel habitat that in turn should assure its survival.  The USFS has recognized that logging can be and has been detrimental to the habitat, but has also recognized that recent thinning practices are beneficial.  Dr. Frey does not specifically attack the USFS' recent management practice of thinning from underneath, nor does she state that all logging is detrimental.  Even if she were referring to recent management practices, she specifically uses the word "can" and not the word "is," connoting that logging does not always reduce canopy closure and tree basal area, and does not always result in poor seed production.  Dr. Frey's statements therefore do not show that the USFS was arbitrary or capricious when it concluded that the project would benefit the Abert's squirrel.  The Plaintiffs additionally assert that the USFS "concedes" that timber harvesting can have an effect on squirrel density.  Plaintiffs' Reply Memorandum Brief In Support of Motion for Preliminary Injunction at 7.  This "concession" by the USFS was, however, based on its citation to a 1979 study that had been done in Utah.  The Court has no way of determining whether the timber harvesting that had occurred in that study included the USFS' recent thinning from underneath management practice, and even if it did, the language again includes the words "can."  The 1979 study does not show that the USFS was arbitrary and capricious when it found that this particular project and the practices involved would benefit the Abert's squirrel.

requires that all stands be surveyed before harvesting, and high squirrel activity areas will be protected from treatment.  See AR 012795.  Thus, the USFS rationally concluded that Abert's squirrel would benefit from implementation of the A/C Projects, because the silvicultural treatments will create a more diverse habitat for the squirrel, which will provide higher quality habitat and better foraging opportunities.  See AR 012952-012953.

If the Plaintiffs had provided any evidence from the record that the A/C timber project was going to harm the Abert's squirrel, or that refuted the USFS' conclusion that the timber project was actually going to benefit the squirrel, the Court might find the USFS violated NFMA by approving the project in light of Dr. Frey's report that the Abert's squirrel population had crashed in 2002, and in light of Dr. Frey's conclusion that the squirrel density was 0 to .02 per acre.  The Plaintiffs, however, have not shown that the USFS' conclusion that the project would benefit the squirrel is irrational.  The Plaintiffs' apparent equating of all harvesting with adverse impacts on the Abert's squirrel is untenable in light of the biologists' recognition that recent management practices of thinning from below and group selections across the Forest enhances the Abert's squirrel habitat, assuring its survival, and in light of Dr. Frey's recognition that habitat should consist of a combination of tree class ages.

## II.    THE COURT WILL NOT ADDRESS THE MERITS OF THE PLAINTIFFS' NEPA CLAIMS BECAUSE THE PLAINTIFFS DID NOT SUFFICIENTLY EXHAUST THEIR ADMINISTRATIVE APPEALS.

The Plaintiffs also allege that the USFS violated NEPA by failing to take a "hard look" at potential environmental impacts to the Rio Vallecitos and by failing to prepare an additional Supplemental Environmental Impact Statement ("SEIS") based on new information concerning impacts to the Abert's squirrel.  Motion for Preliminary Injunction at 13-15.  The Court will reject

the Plaintiffs' NEPA claims.  The Plaintiffs did not raise these claims with the USFS before bringing the claims to federal court and therefore failed to exhaust the administrative process.

The Plaintiffs argued, at the hearing, that they were not required to use "magic language" to exhaust, and that their general claims were sufficient to satisfy their exhaustion requirements.  See Transcript of Hearing at 39:13-40:13 (taken February 10, 2006).  Although the Court agrees that they do not need to use "magic language," the Court does not believe that the claims they brought were sufficient.

In their appeal, the Plaintiffs discuss both NEPA and the Rio Vallecitos, but not in connection with each other.  The Plaintiffs argued in their appeal that NEPA was violated because the USFS was improperly relying on the *Management Recommendations for the Northern Goshawk in the Southwestern United States* ("MRNG").  See AR 012857-012858.  This NEPA argument was not sufficient to put the USFS on notice that the Plaintiffs had a complaint that the USFS' alleged failure to take a hard look at the Rio Vallecitos violated NEPA.  There is no connection that the Court can see between the Plaintiffs' NEPA argument concerning the Northern Goshawk and the USFS' alleged failure to take a hard look at the Rio Vallecitos.  The agency had no way of knowing that the Plaintiffs were bringing a NEPA claim concerning the Rio Vallecitos by looking at the Plaintiffs' Northern Goshawk claim.  The Plaintiffs did not sufficiently exhaust their Rio Vallecitos NEPA claim by brining their NEPA Northern Goshawk claim.

The Plaintiffs also argued, in their appeal, that the A/C Projects violated the Clean Water Act because of potential damage to the Rio Vallecitos.  See AR 012859-012860.  If the Plaintiffs were raising a NEPA claim alleging that the USFS had failed to take the required hard look, it was not raised with "sufficient clarity to allow the decision maker to understand and rule on the issue raised."

There is nothing in the appeal that would put the USFS on notice that the Plaintiffs were bringing a NEPA claim for failure to take a hard look at the Rio Vallecitos.  Although "magic language" is not necessary, the Court does not see anything in the appeal that would indicate to the USFS that it needed to address a NEPA claim concerning the Rio Vallecitos.  The Clean Water Act issues are different than NEPA issues.  The Clean Water Act raises substantive claims while NEPA raises procedural claims.  The Plaintiffs did not raise their NEPA issues concerning the Rio Vallecitos in their administrative appeal.

Similarly, the Plaintiffs' arguments on appeal, concerning their NEPA claim for the Terrestrial Ecosystem Survey and their Abert's squirrel NFMA claim, did not put the USFS on notice of the Plaintiffs' NEPA complaint concerning Dr. Frey's report on the Abert's squirrel, or the Plaintiffs' NEPA complaint concerning the Rio Vallecitos.  After reviewing the Plaintiffs' administrative appeal, the Court does not believe that the Plaintiffs sufficiently raised their current NEPA claims in their administrative appeal.  The only NEPA claims that the Plaintiffs brought concerned the Northern Goshawk and the Terrestrial Ecosystem Survey.  Because the Court finds that the Plaintiffs did not exhaust their NEPA claims, the Court will not address their merits.

## III.   BECAUSE THE PLAINTIFFS HAVE NOT SUCCEEDED ON THE MERITS, THE COURT WILL NOT ISSUE A PERMANENT INJUNCTION.

The Plaintiffs request that the Court enjoin the implementation of the A/C project.  See Plaintiffs' Reply Brief on the Merits at 24.  Because the Court has resolved all disputes in this case in favor of the USFS -- not deciding the merits of NEPA claims and NFMA regulatory claim for failure to exhaust, and finding in favor of the USFS on the NFMA consistency and substantive claim -- the Court will not issue a permanent injunction.  See Fisher v. Oklahoma Health Care Auth., 335

F.3d 1175, 1180 (10th Cir. 2003)("A party requesting a permanent injunction bears the burden of showing: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.").

Because the Court finds that the Plaintiffs did not exhaust their NEPA claims, the Court will not address the merits of them.  Additionally, because the Court finds that the 2000 transition regulations and the "best available science" apply, and because the Plaintiffs did not exhaust their arguments concerning such, the Court will not address the merits of the Plaintiffs' regulatory NFMA claim.  The Court also finds that Carson Forest Plan's Monitoring Plan's monitoring requirements are not condition precedents to the approval of projects, and thus the USFS did not violate NFMA's consistency provision.  Finally, the Court finds that the USFS did not violate NFMA's substantive provision.

**IT IS ORDERED** that the Court will not address the merits of the Plaintiffs' NEPA claims and NFMA regulatory claim for failure to exhaust.  The Court finds in favor of the USFS on the NFMA consistency and substantive claim.  The Court will not issue an injunction.  The Plaintiffs' appeal is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Steven Sugarman
Belin & Sugarman
Santa Fe, New Mexico

   *Attorney for the Plaintiffs*

Sue Ellen Wooldridge
   Assistant Attorney General
United States Department of Justice
   Environmental and Natural Resources Division
Washington, D.C.

Kathryn Toffenetti
Mary Ann Joca
   Office of the General Counsel
United States Department of Agriculture

-- and --

Andrew A. Smith
   Trial Attorney
United States Department of Justice
Environmental and Natural Resources Division
Albuquerque, New Mexico

   *Attorneys for the Defendant*